Good morning, Your Honor. My name is Jack Clark. I, along with my co-counsel, Dan Shinoff, and Paul Carelli, represent San Dieguito Union High School District. Your Honor, I would like to address the core issue in this case, which was at least briefly addressed by the prior case. That is the trial court error in permitting parents who acted according to the hearing officer's finding in bad faith in developing an IEP plan for their child and who never intended for the child to attend public school to collect attorney's fees of the prevailing party in administrative action of the IDEA, where the technical violation of no transition plan could have been easily avoided had the parents simply interacted appropriately with the district. Counsel, in your case, the district court did apply the degree of success standard. Is that correct? Yes, it did, Your Honor. We are dealing here with a standard of abuse of discretion. So that is the question, is did the district court abuse its discretion in the award? It abuses discretion as to the calculation award, but there is an issue of law in terms of whether the district court appropriately found that the petitioner below was the prevailing party. And also, Your Honor, I would like to, I deserve two minutes for rebuttal. We believe, I'm sorry. Go ahead. We believe that as to the first issue, were they a prevailing party, we believe the answer to that is no, for these reasons. In the Hunger case, the Seventh Circuit case, the court made it clear that in terms of determining a prevailing party, a nominal or de minimis decision, de minimis, excuse me, a de minimis win will not be a basis for attorney's fees. In this case. Could you call it de minimis? They got a monetary award. They got a monetary award. It was essentially an interim award, Your Honor, in this way. We get nominal awards in the form of $1 a lot. This isn't $1. No. I couldn't tell. How much money did it amount to? Your Honor, the record wasn't clear on that. It was tuition for the period from October until the IEP was held in the first part of 2003. Like three or four months reduced by 50 percent. Exactly. But if private school tuition here is anything like private school tuition I'm familiar with, we're probably talking thousands of dollars. Your Honor, that amount is not the critical issue here. It is how the court or the hearing officer came to that conclusion. Well, it's just hard for me to understand how that's de minimis. I mean, I understand it's not much. It may be a small fraction of the request. Yes. But usually de minimis or nominal is taken to be six cents or $1 or something that's trivial. In other civil rights actions, that's true, Your Honor. In this situation, in terms of looking what the parent was actually looking for, it was de minimis. And actually it was transitional. It was a transitional award pending the period while a determination was made as to the written transition plan. But they were getting the money. There wasn't a question about that. The parents were entitled to four months of tuition. I believe the record says the tuition was over $8,000 a year. And so if you've got four months, about half the year you've probably got about $4,000 reduced by 50 percent. It's probably $2,000 in damages here. You did not take an appeal from the hearing officer's judgment on that one, did you? No, we did not. So you conceded and you presumably paid the $2,000 at this point? Yes, Your Honor. Okay. And why is that de minimis? That is de minimis, and I'm using a term from the Hunter case, Your Honor, transitional relief. And that is to say in this case, and the record is clear on this point, and the hearing officer noted even in the hearing officer's decision that Ms. Nest, who was a program specialist for the district, testified that there was a transition plan. What the hearing officer said was that the transition plan had to be in writing. And therefore, even though the district's plan was procedurally appropriate and substantively appropriate for that period of transition, there was simply going to be reimbursement decreased by 50 percent in light of the parent's conduct. That case, Your Honor, presents the same sort of analysis as in Hunger, which says, look, you wanted a full determination that perspective placement at this nonpublic school was appropriate. You did not get that. You wanted a finding that the goals and objectives were inappropriate. You did not get that. You wanted a finding that the determination of unique needs on the child were inappropriate. You did not get that. The only thing you got was a written transition plan, and there was a significant amount of testimony by the district that the district was sensitive to the issue of transition, had actually considered that, and actually had discussed that at the IEP and had a plan, in this case the Learning Center, to specifically address that. Therefore, the only thing that the parents received in this case was a written transition plan. Well, that's not quite true. I mean, I think the analogy to Hunger is appropriate, but I don't recall in Hunger there being any award of tuition or reimbursement for tuition. In this case, we had what amounted to a finding that even in the context where it could be said maybe it was all the parents' fault, the hearings officer concluded, while she imposed a reduction of 50 percent, concluded that at least some portion, at least 50 percent of the tuition, until the point in time when the student's transition could be affected, it would be appropriate to make the school district pay for that share of the tuition. And the Hunger analogy still applies, Your Honor, for this reason. As the Court will recall, in Hunger, nine months, I believe, eight to nine months of counseling services was provided. The district was going to have to pay for that. So it is not, the question is not whether or not the district has to pay something. And the Hunger analysis was, look, that's just transitional services. What did you, what were you really seeking? What did you really get? That, taken with the fact that the hearing officer found, and this is a legal issue that we believe this Court should address, the hearing officer found that the parents had not appropriately dealt with the IEP process, had not appropriately informed the district of their concerns, and therefore they are considering their conduct, the reimbursement alone should be reduced by 50 percent. The trial court below, the trial court below in this decision, said that it was going to look at the issue of whether or not their conduct, pardon me, whether their conduct was so egregious as to essentially become bad faith. The statute, excuse me, the Code of Federal Regulations at 30 United States Code Section 300.513 does not have a bad faith standard. Instead, that code section simply provides that the reduction of fees may occur if the parent during the course of the action or proceeding unreasonably protracts the final resolution of the controversy. So the hearing officer made a finding of bad faith. The trial court essentially said, well, we don't find it so egregious. In so doing, the trial court essentially confirmed the finding that the parent's course of conduct did protract the final resolution of the controversy. The reason why that's important is that the court did use its discretion to decrease the amount of fees 40 percent without consideration of the parent's conduct. We believe that if those two are taken together, that along with the issue of whether or not they actually should be considered a prevailing party, the attorney's fees that should have been awarded should have been zero. I'm not sure that the parent's conduct has the same impact on what's being awarded or dealt with. In the case of the hearings officer, she was calculating, okay, how long did it take us to wind up this dispute? And it took longer than it should have because of the parent's contact, which she characterized as bad faith. And I'm not sure she means bad faith in the same context that a court deals with that term. But it really doesn't matter for my purposes. It shouldn't have taken until, I've forgotten, in January or whatever to resolve the dispute. And so this tuition that has to be borne for the period of time, we're going to make the parents bear half of it themselves.  And the fact that it takes longer to resolve the dispute does not necessarily mean that the attorney's fees are extended. It's likely to be somewhat higher because attorney meters click in the background slowly even if not much is going on in the case or it takes that much longer to revisit the case. But just because it takes until January to solve it instead of September doesn't mean what the attorney has to do is necessarily going to be any different. So although I understand the argument that says, well, some of this is the fault of the parents that it took so long to solve, does that necessarily speak to what the quantity of attorney's fees should be? Yes, absolutely. And the reason is that what the hearing officer was saying was the parents had not been forthright in terms of what their concern was. Had they simply said, what we need here is a written transition plan. We just want it in writing. Then that would have been the issue in controversy. Rather than having a blunderbuss attack which says the goals and objectives are appropriate, you haven't met the unique needs, you haven't assessed, you haven't looked at the proper sort of analyses in terms of what this child actually is going to need in the placement, a hearing on a written transition plan could have been done that fast. Well, I mean, these parents were in a lot of distress, I'm sure. And I'm just speculating. You know, sometimes you call these schools and you get the brush off and nobody pays attention to you. And, oh, it's 3 o'clock, I've got to go home, you know. And who knows? You know, some people get, parents can get upset. I understand that, Your Honor. And that prolongs stuff. And then they, you know, they're the ones that probably don't, you know, these are complicated things. There's a lot of emotion connected with them, I'm sure. It has to be. I understand that. And, by the way, I'm nodding my head, not necessarily because I agree with the suggestion that school districts don't respond to parents. I didn't notice you nodding your head.  Thank you. The reason I was nodding, Your Honor, is that the concerns that Your Honor raised in this case really aren't present in terms of the record. Yeah. The IEP was conducted on July the 24th. The parents did not, according to the hearing officer's findings, act in a proper forthright way with the district. The district then made reasonable efforts to work with the parents to get resolution in terms of the IEP issue. And counsel has suggested in his brief, well, you know, we made efforts to mediate and such. The parents have the right under the IDEA and California law to call an IEP meeting at any time, and an IEP meeting must be convened within 30 days. That process was always available to them. You don't have to go to due process to get the district's attention on that issue. And, in fact, the parents had the district's attention because they had engaged in the IEP, and then it was in this case, which is uncommon, it was the district that filed for due process. Which actually makes this case unique. I haven't encountered that before in the IDEA cases I've dealt with. I can understand why the school district would want to get a resolution. Otherwise, the meter's ticking in the background and could take a long time. I just haven't encountered that. One of the complications is that the school district started the process for the due process hearing we're now talking about, and the school district didn't get exactly what it asked for either. I mean, it did not get an adjudication that the plan was appropriate because of the missing piece. Doesn't that have some impact on the prevailing party analysis? Not in this case, Your Honor. The school district did get what it was looking for. The hearing officer was very clear. Substantively and procedurally, the district had addressed all of the child's unique needs. The hearing officer even noted that the transition issue was discussed during the IEP process. The hearing officer said, all you need to do is to have a written transition plan. The hearing officer said, use the terms, easily remedied. And the hearing officer said, that is not a fatal error. That goes back to the initial point. That was transitional relief, simply saying, during the time that you, because your program is appropriate, during the time that it takes you to call another IEP meeting to write out the transition plan, you'll reimburse the parents. But as soon as that happens, then your program takes place. And just to clarify, the reason the district filed for due process is twofold. Your Honor is correct. You don't want to be in the twilight zone during the entire school year, so you do need to get a determination as to whether or not you appropriately cared for the needs of the child. But also in a California law, there is a provision, I believe it's 56346 of the Education Code, in terms of IEPs that if the parents refuse to consent, then the district must file for due process at some point. So there was a statutory basis, not simply a strategic basis, for the school district to do what it did. I want to address briefly, and I do want to, I'll take two and a half more minutes and I want to retain two or three minutes. Counsel in his brief asserted that the hearing officer's determinations under the prevailing party status, under the four criteria in the conclusion, was making factual determinations. We believe that assertion is not correct. The determination of whether a child's educational program is both procedurally and substantively appropriate is not just a factual determination, it has to be an application of fact and law. And in fact, reading through the hearing officer's decision, the hearing officer broke down very clearly. Did the school district meet the unique needs? Yes. Did the school district create appropriate benchmarks based on goals and objectives? Yes. Was the placement appropriate? Yes. The district also created a learning center arrangement so that the child's anxiety could be dealt with in the learning center arrangement. That was appropriate. And so in this situation, for the parents to take the position that the hearing officer's conclusions were simply factual assert, factual determinations, and therefore any flaw, no matter how small, no matter how technical, creates a fatal flaw in the program in terms of the provision of a free or public education for the child is simply an error. My last point before I sit down for a bit of rebuttal. The record is clear. And the argument asserted by the parents was that they prevailed on the only issue presented. That was simply incorrect. When the record is reviewed, counsel for the parents made it clear that there were numerous issues upon which the parents were claiming they needed relief. And as a result of those numerous errors, according to the parents, they should receive prospective placement at the nonpublic school board. They lost that issue. And therefore, the attorney's fees award, considering the conduct of the parents, which was inappropriately thrown out by the trial court, the amount of recovery, the technical nature of recovery, and when I say the amount of recovery, I'm not talking about dollars, Your Honor, because as in hunger, the district had to pay for counseling for nine months, which could add up to hundreds of dollars. We're not talking about a dollar figure. We're talking about what was at issue and what was the relief. I'll retain my two-and-a-half minutes. Thank you, Your Honor. Roberts. May it please the Court, I am Eric Freitas, counsel for the Respondents v. Crawford. The first part of counsel's argument is that we are not the prevailing party, and while we would be more than willing to accept the court's ruling affirmation of the district court's opinion based on the fact that we received some thousands of dollars, I think that's missing the point in this case. This case at the hearing office level was not about money. Let's step back and let's see the forest for the trees. This was a child who was emotionally disturbed with anxiety disorder and depression who attempted suicide on more than one occasion. His parents pulled him out of a middle school with a population of some hundreds, and after hospitalizing him for about or treating him for about three months, put him in a nonpublic school that had a population of less than 100 kids and a classroom of about eight, and put him into full-time therapy with a psychologist. That happened during the 2002-2003 school year, excuse me, 2001-2002. They filed due process. That matter was settled with a promise on the part of the district to hold an IEP during the summer to develop a program for him for the following year when he was scheduled to go to a high school campus that had over 3,000 students. The IEP was held in July, and the district's offer was to bring him back, put him on the high school campus in six full-time academic classes, and the sum and substance of his IEP was he would get a couple of hours a week of counseling from a high school counselor, and if he felt that he needed some help, he could leave one of his six academic classes and go to the learning center where he could sit and relax. That was the program. The parents heard this at the IEP meeting and said, we're not bringing our kid back. Based on the psychologist — They may have said it to themselves, but they didn't say that to the school district. No, at the IEP, they rejected the IEP and said, we're not bringing him back. That's very clear on the record. That is in July. They had actually retained a place for him at the school because they feared what the school district was going to offer in July, and their fears proved to be true. If they had brought him back, if they had accepted the IEP, they would have brought him back to the high school in September. In fact, they told them that they were not accepting. I think what Your Honor is referring to is the following. At this IEP meeting, County Mental Health was there as well. There are two agencies that provide services to this child. A parent is entitled to accept some services and not others. They rejected the placement at Torrey Pines High School, and they didn't know whether or not to accept the County Mental Health services that were offered by the County Mental Health representative and County Mental Health at the IEP. So they told the IEP team that they were going to consult with the psychologist, Dr. Perlman, and they would advise the school district whether they would accept those County Mental Health services. At no time did they say that they were not — they were going to accept the high school. They said that they were not pleased with the high school, that they weren't going to put him there. The district has attempted to categorize that as we told them we would let them know whether or not we would accept the high school placement. It was very clear from the IEP meeting itself that they had rejected that. That was Mr. Crawford's testimony at the hearing, and there was no contrary testimony to that. Now, at that time, after the IEP, the counsel for the Petitioner, because of health reasons, withdrew, and my office took over the case. Roberts. Well, let me stop you there, because I'm looking at the hearing officer's decision. And it says Michael's parents did not follow through with their promise to provide a written statement of the areas of agreement and disagreement. Well, I agree. As I say, the parents had said that they would tell the school district whether  And Ms. Cromer, the parents did not let them know whether or not the county mental health services were going to be accepted. So I agree. The letter that was promised. Let me go back earlier at the meeting. Michael's parents refused to sign the IEP. They refused to sign to indicate their attendance and refused to identify the areas they either agreed or disagreed with. The hearings officer seems to be saying not, it was so clear, they said okay to this, not okay to this. The hearings officer is saying they walked away and didn't say. I think that's an overly broad statement by the hearing officer, that the parents didn't identify what they would and wouldn't accept. But do I listen to what you say here in argument, or do I look at the record in the hearing officer's decision, which is not beneficial? Well, I agree that the hearing officer's decision is correct in that the parents did not identify the county mental health services that they were going to accept versus the program that they were not. But let's assume for a second that they didn't say whether or not they were ever going to accept the high school program. I don't think the result is necessarily changed, is not changed in this case. There was no psychologist at the meeting, the schools, the, excuse me, the school psychologist participated, but the treating psychologist did not. The parents intended to consult with the treating psychologist and find out what he thought about what was offered. As it turns out, he said your son will commit suicide if you put him there, don't put him there. And so they, then the attorney withdrew, I became involved, and after a vacation I immediately let them know he's not attending the school, the public program, he's going to stay at the nonpublic school. At what point did you tell them that he would not be attending Torrey Pines? I believe that it was about October 5th. It was 5 days before the school district filed for due process. When I, when I took over the case, I contacted the school psychologist, and this is all in the record through declaration and testimony. I contacted the school, excuse me, the treating psychologist, and I asked is there some way that he can come back to the school, and the psychologist told me we can transition him back. We can bring him back gradually. There's nothing wrong with the program itself, but the program is not right for him at the time. If you put him in this program, it's like taking a kid who doesn't know how to swim and throwing him into the deep end. You've got to teach him how to deal with this program. I contacted counsel, and I said let's continue this hearing. Let's have a mediation and see if we can work out a program to transition him. No. We want to go to hearings, was the school district's response. We asked for a continuance. They said no. We were being forced to a hearing. We didn't even have an opportunity to file a cross-complaint for reason. The earlier IEP was rejected, what month? Was that July? It was a July IEP. Okay. So then July IEP, you do not contact them then until October. Well, I was not counsel. Okay. But the public's not going to contact them. Okay. Just let us clear, yes. The profferts don't contact, whether by you or by anybody else, the profferts don't contact anybody between July and October. That's correct to my knowledge. I'm not aware of it. So the possibility of the school district putting together an appropriate transition plan for young Mr. Crawford at the beginning of the school year is sort of gone, isn't it? Well, yes and no. If you put on the parents the obligation to tell the school district what their legal obligations are and how to perform their duty, then yes. But not if you impose upon them the obligation. In October, you're offering to mediate, see if you can't get some kind of a meeting of the minds, but at no time did the parents ever come back and say here's our concern. Well, that isn't true. At the IEP meeting, the parents said the high school is too large. She can't handle it. Okay. But they can't do anything. The school district can't do anything about 3,000 students. And you didn't prevail on that. Well, no. Excuse me. But they can and they eventually did. The transition plan that was worked out, that counsel is referring to as though it's a little piece of paper, was not just a little piece of paper taking him from the nonpublic school and dumping him on a 3,000 population campus. The transition plan was an entirely new IEP, where instead of attending six academic classes a day, he attended two academic classes. Instead of being on campus from 8.30 to 2.30 in the afternoon, he was on campus for less than two hours a day. The other academics were taken through private tutoring. Gym class was taken through private karate. This boy was not on this campus for more than a couple of hours a day. It was an entirely different IEP that was developed. That was the transition plan. Okay. The hearing officer's decision is issued in December. At what point after that did you meet with the school district to put together an IEP? As I understand it, the IEP was held after the school resumed after the winter break in January. Okay. So that was done in January. And it was a new IEP. It was a new IEP. Okay. And did Mr. Crawford attend public school after that? Yes. They pulled him out of the private school? Well, he attended two hours a day. The rest of the time he did not attend. That was the transition plan that the private psychologist developed. Did he continue at the private school where he was attending at Balboa? No. He was private tutoring and private placement through a karate studio for gym and and increased goals and objectives and increased counseling. And the private psychologist was paid or paid by the school district to attend and develop this new IEP. So what we should be doing or what this court should be doing and what I think the district court did do was look at the result, the forest instead of the trees. They offered a six-course IEP. What ended up with was a two-course IEP. Is the IEP in the record, the new IEP? The new IEP is the exhibit document 27, which is it's exhibit E to the points and authorities in the district court level, which is the court record document 27 forwarded to this court. Okay. So it's a document 27. Yes. And the July IEP for comparison is 0771 through 0783. So you can compare these two programs that were developed. They, the district, is trying to categorize this IEP plan as just all the trick was just we had to write it up. Mary Ellen Ness, the school administrator, testified that there was a transition plan built into the IEP. The hearing officer herself rejected that, said there's no evidence of that. And so there was no transition plan. So what we have is an entirely new program. That was the result, a safe program. What parent is going to take their child who has attempted suicide on more than one occasion and put them in a school environment that his private doctor has said is unsafe? That's what these parents refused to do. And as a result of their refusal, this district filed against them to prove that that program was appropriate, and they lost. The district lost. Now, remember, we did not even seek any relief initially. There was no time for us to file. There was no cross complaint in special aid. So we would have had to file our own request for due process and make a motion to consolidate. And the consolidation motion is denied if it's going to delay the original hearing. And since the district had already indicated that it was unwilling to postpone its hearing, there was no point in trying to file. When we went to the very first day of hearing, the hearing officer basically twisted arms and the district finally agreed to go to mediation. We told the district before the hearing we wanted a transition plan to gradually introduce them into the high school. We told the hearing officer that that's what we wanted, and we asked for an opportunity to mediate. The hearing officer set the mediation and set it on a date when the private psychologist would be available to attend to give his input on to what program was needed, the school district refused transition program, a modified IEP at the mediation. During the hearing, we called two witnesses on the factual issues. The private psychologist who testified and recorded his testimony extensively in the points and authorities, which is exhibit, excuse me, document 27, he goes on and on and on about what this child needs is a transition plan gradually getting his feet wet from a small program on to the high school campus. It is very clear that what we were seeking during the entire hearing was to get him to the high school gradually, not taking him and throwing him to the deep end, but first teaching him how we can handle it. We did not contend that the IEP would be inappropriate for him when he was ready to handle it. We didn't claim the goals and objectives were inadequate, only that the goals and objectives were inadequate at that time. The analogy that I have used here and I used with the district court was the district court offered this young man an Olympic-sized swimming pool that was 12 feet deep and had a beautiful diving board and lanes and everything else. We're not saying there's anything wrong with that swimming pool. All we said was this young man didn't know how to swim, and if you take him and put him in that swimming pool, he's going to die. First you have to teach him how to swim before that swimming pool is appropriate. The hearing officer looked at all the elements of the swimming pool and said, well, there's nothing wrong with the depth and there's nothing wrong with the lane markers. We never contend that there was anything wrong with the lane markers or the depth. All we contended was it was not appropriate for him to start there from the nonpublic school, and the hearing officer very clearly agreed. She said this program does not offer this young man a free appropriate public education on the first day of school. What is needed is a transition plan. Frankly, her decision is rather inconsistent. She says that the swimming pool is appropriate, but not yet. Well, either it is appropriate on the first day of school or it's not appropriate, and we contend that it was not. We never contended that the program was not good enough for this boy once he learned and became accustomed to the school. Besides which, those were, as I say, factual issues. The issues identified by this hearing officer at the time were, was the program appropriate? That was what the district filed to establish. Had they been able to establish that, they could have cut off services to this young man if the parents did not bring him back to the school and put him on the campus in that program. They lost. The parents sought a transition plan. They got a transition plan. Compare the IEPs. Entirely different. And the district rejected the concept of a transition plan on at least four occasions, by my office, by the testimony. Mediation was unsuccessful. I'm still trying to find that new IEP. You told me that it was the document number 27. No, no, no. In the ER, that is. I don't believe it is in the ER. Not in the excerpts of the record? We had six volumes and we didn't get that in there? Well, because that was not part of the administrative record. That did not incur until January, which was after the IEP hearing, excuse me, the IEP hearing was over. You base most of your argument here on the fact that it was very, very different from what they found. It was filed with the district courts to show that it was a different IEP. But we didn't get into the excerpts of record, which are prepared separately. Because this isn't the district court's record. This is prepared by counsel. If it's not in there, I apologize. It is in the record of documents transmitted by the district court to this court. And perhaps there is a clerical error on the part of the panel. Those records aren't made available to every member of the panel without special arrangement. This is what we get. Well, I will only say that I hope it's not a critical error. I think that I don't know how to respond to that, Your Honor. The IEP was very different. As I say, it is Document 27, Exhibit E, to the points and authorities at the district court. Since it's the district court's decision that was being reviewed, that is being appealed, not an appeal from the hearing office decision, I suppose I assume, and we know what happens when one assumes, that the district court's records and their records are sent to this court. To my knowledge. That's why we have excerpts of record. So that you can give us a roadmap of what it is that we need to look at. I understand. I understand. That's a common oversight. And I apologize if it causes the court inconvenience. If it's necessary. It's probably in the district court in San Diego. Well, I guess, again, I assume that if the district court's decision was sent up here with part of the court record, that the pleadings leading up to it were as well. We did receive a notice of transmittal from the district court indicating that that was sent up. I don't know. I believe the original ER was designated by the attorneys for the district. We didn't see anything wrong with it. And I think it acceded to their designation of records. So we may have overlooked it. That's all we get is the ER. Okay. What resulted was a very different IEP. By the way, you made reference in the previous argument and in this argument to the substantial, the degree of relief standard. I've read this Court's decision in the Kerr v. Screen Artists Guild, 1975, where you, and that's cited in my brief, where you enunciate 12 standards for a review of attorney's fees. The eighth standard there is the results obtained. And so I think clearly this Court has adopted and applied. Do you know who the district judge was who was reversed Kerr v. Screen Artists? I'm afraid to ask, Your Honor. It's me. I'm afraid. Well, perhaps years of wrong wisdom, Your Honor. I could write a book on that case. Well, the Hensley, so-called Hensley factors that were adopted in Kerr, the results obtained are there. But there are other factors as well. I don't mean to argue the previous case, but results obtained is not necessarily the only factor. Special ed attorneys, and I'll say this somewhat in conclusion, special ed attorneys are, to a large degree, different, and special ed cases are different than other civil rights cases. Parents don't win anything. They only get what the law says they're entitled to by definition. I realize that sometimes through settlement or whatever they may get more. Attorneys, a lot of attorneys take these cases on contingencies, and not contingencies the way PI attorneys do, that if you win and you get 30 or 40 percent, that makes up for the losses on the cases, and that's why contingencies are allowed. Contingency in a special ed matter is if you win, you get paid. If you lose, you don't get paid, because most of these parents don't have the money to pay attorneys, and attorneys take it on contingency. There would be a real chilling effect unless a rule that applies that makes sense, which I think is already the rule that applies here. Look at the overall result. Unless that applies to special ed cases, how many parents, how many who already have problem bringing up kids is tough enough, bringing up a disabled child is an additional burden, how many parents are going to risk their mortgages or their life savings to hire an attorney to fight over a few thousand dollars or a nonpublic school that costs $8,000 a year, and risk not raising every possible issue and losing on some of the issues and losing more than you win? What pyrrhic victory, what kind of a pyrrhic victory is that? And unless there is a remedy, there is no right. That was why Congress modified the IDEA very quickly after a Supreme Court, the Robinson case, said that there are no attorney's fees allowed. The Congress, bipartisan Congress, said you've got to have attorney's fees, because unless there is private enforcement of the IDEA, we're going to have abuse. We see abuses. These parents risked $40,000, and they have been penalized by this district court about 40 percent of that. Now, we did not appeal, but in my remaining few seconds, if this Court remands, I would only ask that you look at the factors that we raised in our brief on why there might have been an abuse of discretion and the issues that this district court may have considered. We can't tell, frankly, from the district court opinion, other than a brief statement that the parents didn't prevail on all issues, why the district court reduced it by 40 percent. We did not appeal. Actually, we did and dismissed it, because we don't think we can show a clear error on the part of the district court. We obviously didn't win everything. We had some money reduced, and there were some factual issues that we didn't prevail on, and we didn't get Balboa. Alito, didn't you want to – wasn't one of your requests that the district court pay for the private education? The district, I'm sorry, the district, the school district, not the district court. At the IEP meeting, excuse me, at the hearing, the school district contended that the hearing officer should design a program that would pass muster if, in fact, she found that their program did not. And I took the position that the judge there was an attorney, not a special educator. But in case the hearing officer chose to grant particular remedy, what we said was, through our witness, the psychologist, that an appropriate transition would be dual enrollment between the private school and the public school and gradually transition him from one to the other, take him instead of 6 and 0, have him from 2 and 4 and then 3 and 3 and then 4 and 2, and that was what we proposed. Now, the hearing officer wrote it up in the opinion that what we were seeking was prospective placement at the hearing. Again, that was relief that we suggested would be an appropriate way of transitioning him from the private school to the public school, but since the hearing officer has general equitable powers, by no means were we locked into that. I think wisely the hearing officer, since she did not have enough information to her – or the expertise to design a transition program, left it up to the parties. Now, that raised all sorts of dangers in and of itself, because if the parties had not developed an appropriate transition plan, then we would have been back in hearing, but luckily the parties did. They sat down, the school psychologist – excuse me, the private psychologist who had to be paid by the district to develop the program, and they developed a program that was almost exactly what the parents suggested would be appropriate. Two classes on the high school campus, four classes handled outside of regular classroom, better goals and objectives, better counseling, et cetera, until he learned how to handle it and he could be transitioned in. So when you compare what was offered versus what was obtained, it's night and day, and the parents got what they wanted. The fact that part of the transition plan was not continued enrollment at Balboa, well, that was something that was worked out at the IEP meeting between the school – the private psychologist and the school. We have no objection to that. In fact, the hearing officer report noted someplace that the parents announced that it was their intent that he'd be full-time at the public high school come the next year. The issue appeared to be what the transition was going to entail, and the parties may have argued differently, but I understood your position reading from the hearing officer that you weren't seeking a permanent placement at the private school, that it was your client's position that Michael was going to be at the public school. The issue was what was the arrangement to be made to transition him. That's correct. We were not granted at the IEP meeting before the concept of transition was invented, if you will, with the private psychologist. That was – Frank, I'll take credit for that. The parents didn't know what else to do. They were offered the high school campus, and they told the school at the time, we're keeping him at Balboa. And, in fact, they had put a deposit down at Balboa. But between that time and the time of the hearing, I, through working with the And that's what we proposed at every step of the way. And that's what was turned down by the district every step of the way. But that's what was ordered by the hearing officer, and that's what we got. And I apologize. Unless the Court gives me permission to supplement the record with that exhibit, which I'd be happy to do. So you can see that the IEP is entirely different. With that, unless there are any further questions, I thank the Court. I would like to ask that the exhibit be submitted. I would like to see it. What is it? Give us a good designation of the exhibit. It is the Points and Authorities. I should write it down. Just give it to the clerk. The exhibit that I would like to see is the IEP. It is Exhibit E to the Points and Authorities that are filed at the district court. Write that down. Will do. Probably the quickest way to do it is ask the clerk here to call the clerk in the district court, and they can get it and then fax it right over here. Mr. Clark, before you begin, I'd like to short-circuit the time that you've got just a little bit. Would you please address the question as to whether the second IEP that was issued in January was substantially different from the earlier IEP? I'd have to look at it, Your Honor, but I believe that there were differences in the IEP, but I want to specifically address that by referring to something in the record, if I might. And you agree that that IEP is not in the record? Yes, I don't believe it is, Your Honor. Well, it's in the record in the district court. It's not in our actions. It's not in your record, yes.  This issue in terms of the transition considerations by the district, Mr. Freitas asked Ms. Ness, and this is at page 0241 of the record, quote, do you believe that the campus at Torrey Pines might be or would have been more anxiety-producing than the Balboa School Program that Michael was in? Ms. Ness, I think we, again, we anticipate Michael to have some difficulties with changing schools. We anticipate that. But, again, we have an environment that we feel we can shrink from Michael in the learning center so that that accessibility learning center throughout the day, throughout his day. She then goes on to say, and this is at page 0259 and 0260, she is talking about the learning center, and this is in response to Mr. Freitas' questioning, if he was able to and wanting to go back to those general classes that he was enrolled in, he would be in those general classes for as long or as short as he could handle. If it were five minutes in each class, he would be there for five minutes. And then she goes on to explain how that strategy was specifically calculated to deal with his anxiety problems, his anxiety concerns. She's describing the July IEP? Yes. This is the testimony from the administrative hearing where she's talking about what they were anticipating. The hearings officer determined that was insufficient. The hearing officer actually said, Your Honor, the evidence establishes, and I'm at page 0966 of the excerpt's record, the evidence establishes that the learning center will provide Michael with the support necessary to integrate into the regular school setting while addressing his emotional needs with the ultimate goal of full integration into the regular education setting. Your Honor, what all the hearing officers said, and she repeated this, that the written transition plan was not a fatal error that was easily remedied. She acknowledged that what the district had done was in consideration of his transition needs. And for that reason, she didn't award a compensatory education at Balboa. So she didn't award anything except for the four months before you came up with the new transition plan, or four or five months. Exactly. An interim remedy. And, Your Honor, I do want to have fortitude. But that does suggest that until such time as you came up with an appropriate transition plan, that you would be, that the school district would be obligated to pay for Michael's education at Balboa. Well, she made that finding, again, with a 50 percent reduction. But she wasn't saying, she was, and in fact, she was very clear. She explained that Ms. Test testified that the transition plan was, this is at page 0968. I'm sorry for my voice. Ms. Ness testified that the learning center has a built-in transition. However, the plan is not presented in writing and is not included in the IEP document. Without a written plan, those working with Michael would not have the necessary information. What she was explaining was it wasn't clearly put down in writing. It wasn't that the learning center was inappropriate. And that goes to a point that I think is extremely important as I finish. Having a written document might be a way that the parents would be able to understand and enforce any problems in the future, too, wouldn't it? Possibly, Your Honor, but again. Not possibly. This is counsel. No. Isn't that the way the parents would know what their rights were? We don't want to be enforcing oral agreements between the school and the parents after they've had a difficult transition here. I understand that, Your Honor. The point was that the district was saying we have a mechanism that was going to essentially mold itself to the child's unique needs. And the hearing officer found that was appropriate. I do want to finish. In fact, I might just have one minute of leeway here. The suggestion that if the transition plan, which was decided, which was agreed upon in 2003, was different than that in July of 2002, I think should be addressed with great care and some caution. School districts regularly, in order to work with parents, will put things into IEPs that they might not think are necessary to provide a child with faith, even if just for the purpose of getting agreement. The fact that one IEP is different from another at a different point in time, again, considering the fact that children, youngsters, are different based upon what happens to them in interim periods of time. This was a very difficult period of time, heated as between the district and the parents. The child was out of school for a period of time. The fact that a subsequent transition plan at a different point in the child's development might have been different than what the school district would have been recommending in July of 2002, we believe should not be taken as evidence that what the district was offering in July of 2002 was inappropriate. I take it a student who's in school continuously may have an IEP that changes substantially from one year to the next. That's exactly right, Your Honor. And that's why the law says that a party has a right to call an IEP on 30 days' notice at any time during the school, during the child's educational program. And I added one final thing. Well, I mean, are you saying that the second IEP that was developed was really there to sort of placate the parents and that you just had to see how the thing just worked out as a law? I'm saying that each IEP. Did they not have to do all that? I'm saying that under an established, established, established decisions of the Court, Oregon v. Adams says that each IEP is a snapshot in time. Each IEP is a snapshot in time because each IEP has to make determinations based upon the information available to it. The Court has been very clear. We're not going to look back and decide in hindsight whether an IEP was appropriate under circumstances like this. That's the point I'm trying to make, Your Honor, that simply because a snapshot in June, in January or February of 2003 says that the child's transition plan looks like this versus the snapshot in time of July of 2002, it looks like the transition plan should look like this. The two do not equate that one should have been more appropriate than the other. Thank you. All right. Thank you.
judges: Pregerson, Clifton, Bybee